# Mary Tarpey v. Security Trust Co.

1. INSURANCE—*False Statements in Applications.*—A statement which is merely a copy of the application to another company previously made, and which was true when made, no one being deceived thereby, can not be treated as a false statement made to deceive the insurance company.

2. SAME—*Cancellation of Policies—Fraudulent Statement in Application.*—Where matter in an application for insurance can be imputed to the insured as statements fraudulently made by him, the policy is subject to cancellation at the election of the insurer.

3. SAME—*The Examining Physician the Agent of the Company.*—The physician who examines the applicant for life insurance is the agent of the company, and if he makes misstatements or induces the applicant to do so the company will be estopped to set them up as a defense.

**Bill to Cancel Policies of Insurance.**—Trial in the Superior Court of Cook County; the Hon. HENRY V. FREEMAN, Judge, presiding. Hearing and decree for complainants. · Error by defendant. Heard in this court at the October term, 1898. Reversed and remanded with directions. Opinion filed March 16, 1899.

William C. Cummings, a resident of Chicago, made an application to the Security Trust Company, defendant in error, for two policies of insurance on his life, one for $3,000, the other for $2,000, payable in case of his death to his sister, Mary Tarpey, plaintiff in error. On the 15th day of October, 1895, said policies of insurance were issued and delivered to said William C. Cummings.

In November, 1895, Norman Kellogg, the general agent of the defendant in error in the city of Chicago, went to the home of said Cummings, stated to him that certain statements in his application were untrue, and tendered to him the premium paid by Cummings and demanded from him the policies. Cummings refused to accept the tender or return the policies. On the 14th day of November, 1895, the original bill was filed in the Superior Court, asking for a decree canceling the policies of insurance on the ground that they were obtained through fraud and misrepresentation in the application. While said case was pending Cum-

mings died, on the 22d day of February, 1896. His death being suggested, by leave of court, the bill was amended, and Mary Tarpey, plaintiff in error, substituted as defendant. Demurrer to the amended bill having been sustained, appeal was taken to this court, where the decree was reversed and the cause sent back to the Superior Court for trial.

The Security Trust Company is a life insurance company organized under the laws of the State of Pennsylvania, qualified under the laws of Illinois and doing business in Chicago. It was organized for and its business was to insure the class of lives which are sub-standard, persons with physical imperfections, deformed persons, those with loss of limb, eyesight or hearing, and those who are subject to attack of acute diseases, those with unfavorable family histories, and those who had been rejected as bad risks by other insurance companies. For insuring this class of persons it charged higher premiums than the old line companies charged for good risks.

In October, 1895, Kellogg was general manager of the western department of said company, with his office in Chicago, and at that time put an advertisement in a newspaper in Chicago telling the nature of the company's business and requesting insurance agents who might have rejected risks to bring them in to be insured by his company. Two agents, Harry Bate and Louis Neuer, who at that time were canvassing for the Iowa Life Insurance Company in Chicago, saw this notice in the paper, went to Kellogg's office and told him they had a customer who had made application to the Iowa Life, and that they were sure he would be rejected. Kellogg explained to them the nature of the risks his company was insuring, gave them pamphlets and printed matter explaining the company's business, and told them if the Iowa Life rejected their applicant, they should bring him in and the Security Trust Company would insure him, and made an arrangement with Bate and Neuer as to how they were to work for the company in bringing in rejected applications. They afterward brought in a number of the rejected risks.

On the 6th of October, 1895, Bate and Neuer had pro-
cured Cummings to make application for a $5,000 policy
in the Iowa Life Insurance Company. Cummings signed a
written application to that company, in which he stated:
" I have never made application to any life insurance organ-
ization which was declined, and I am in sound physical
condition. I have never had disease of the lungs; have had
pneumonia." Dr. John Ridlon examined him on this appli-
cation and in his signed report to the Iowa Life Company,
said Cummings had a prolonged expiratory murmur at the
apex of the right lung, and reported the risk as " bad."
This application, together with the doctor's report, was sent
to the Iowa Life Company on October 7th, and in four
days thereafter was rejected. Dr. Ridlon, on the day he
made this examination, told the agent Bate that the Iowa
Life Company would reject Cummings upon his report.
Bate then went and got from Kellogg a blank application
and medical examiner's report to the Security Trust Com-
pany. Kellogg then told him a copy of the Iowa Life
examination would be sufficient, and on the 7th of October,
before they had forwarded Cummings' application and med-
ical examiner's report to the Iowa Life Company. Bate
made a copy of the application and Dr. Ridlon made a copy
of his report on these blanks of the Security Trust Com-
pany, and held them until they were notified of the rejec-
tion by the Iowa Life Company; Bate and Neuer then took
these copies and went to Cummings' house on the 11th of
October and told him, " We can not get you in the Iowa
Life, but can get you in the Security Trust Company," and
showed him the difference in the premiums—that the Secu-
rity Trust Company charged thirteen per cent more, and
read to Cummings from the Security Trust Company's pam-
phlet what risks it insured, read to him about the medical
examination, gave him the pamphlet and handed him the
copied application and medical examiner's report and told
him it was a copy of those he had signed for the Iowa Life
Company four days before, and asked him to sign them,
and told him that they had copied them. Cummings signed

them without reading them. Bate then took them and turned them in to Kellogg, the western manager. Bate had been told by Kellogg that the Security Trust Company would accept copies from the original application and medical examiner's report made to the rejecting company, and Bate told Cummings this when he asked him to sign the copies. Cummings signed without reading the copies, and Bate signed as agent of the Security Trust Company. This copy is dated October 6, 1895, the same date as that of the original application sent to the Iowa Life Company. Bate told Cummings they had copied the application and medical examiner's report from the original sent to the Iowa Life Company, and asked him to sign them as copies. He did so and did not read them. Bate left the pamphlet with Cummings. Bate then took them and gave them to Kellogg in his office at 162 La Salle street, and Kellogg read them and Bate told him that they were copies of the Iowa Life papers and asked Kellogg if he thought it would go through. Kellogg said he thought it would. Kellogg then sent them to the company's home office in Philadelphia.

In the copy of Dr. Ridlon's report thus sent to the home office of the Security Trust Company, and read by the chief medical officers and officers authorized to accept applications and issue policies, is the following:

" Are the respiratory organs, lungs, pleura, larynx, etc., free from any indication of disease ? Answer. No. Is the respiration full, easy and regular ? Answer. No. Number of respirations per minute is twenty-two and the rate of pulse (full minute) eighty-five; there is a prolonged expiratory murmur at the apex of the right lung."

There was also sent to the home office by Kellogg, along with the application and medical examiner's report, a certificate of medical inspection signed by Dr. Ridlon, and dated October 11, 1895, which informed the company that Cummings was the same person whom he had examined on October 6th for the Iowa Life Insurance Company, and that there had been no change in his condition. Upon these papers the company issued the policies in question and sent them to its western manager, Kellogg, who then knew Cum-

mings had been rejected by the Iowa Life Company; he gave them to Bate, its agent, who took them to Cummings and delivered them to him and collected of him the first quarterly premiums, giving him receipts therefor, and carried the money and gave it to Kellogg.

When the second premiums became due they were tendered the company. Cummings' health remained apparently unchanged until the last part of December, 1895, when he was attacked by a quick consumption, tuberculosis, and died on February 22, 1896. Proof of loss was duly made by Mary Tarpey, the beneficiary. The company refused to pay, and this suit resulted.

The trial court entered a decree dismissing the cross-bill for want of equity, and sustained the bill of complaint and decreed the policies void and ordered them canceled.

S. P. DOUTHART and J. J. KELLEY, attorneys for plaintiff in error.

Fraud is a false representation of material fact, made by the party who is charged with it, with a knowledge of its falsehood, or in reckless disregard whether it be true or false, with the intention that it shall be acted upon by the complaining party, and actually inducing him to act upon it to his damage.

In Development Co. v. Silva, 125 U. S. 247, 8 Sup. Ct. 881, the Supreme Court of the United States lay down the rule in regard to a recovery in a case of this character as follows: " First, that the defendant has made a representation in regard to a material fact; secondly, that such representation is false; thirdly, that such representation was not believed by the defendant on reasonable grounds to be true; fourthly, that it was made with the intent that it should be acted upon; fifthly, that it was acted upon by the complainant to his damage; and sixthly, that in so acting on it the complainant was ignorant of the falsity, and reasonably believed it to be true." Crocker v. Manley, 164 Ill. 282. See also Lawson on Contracts, Sec. 226 and cases cited; Schwabacker v. Riddle, 99 Ill. 343; Fetter on Equity, 133; Knight v. Gaultney, 23 Ill. App. 376; Mitchell v. Deeds, 49

Ill. 416; Roper v. Sangamon Lodge Trustees, 91 Ill. 518; Walker v. Hough, 59 Ill. 378; Tone v. Wilson, 81 Ill. 529.

An insurance company is estopped to deny its liability on a policy on the ground of false representations in the application, which are declared by the policy to be warranties, if at the time the agent knew or had notice of the facts concerning which the representations were made, and this is especially true if the agent by fraud or misrepresentations induces the applicant to make the false statements. Home Ins. Co. v. Mendenhall, 164 Ill. 458; Michigan Mutual Life Ins. Co. v. Leon, 37 N. E. Rep. 584; Ins. Co. v. Brodie (Ark.), 11 S. W. Rep. 1016; Dunbar v. Ins. Co. (Wis.), 40 N. W. Rep. 386; Protective Union v. Gardner (Kan.), 21 Pac. Rep. 233; Pickels v. Ins. Co. (Ind.), 21 N. E. Rep. 898.

An insurance company is estopped to deny the existence of facts known to its solicitor at the time the policy was written by him, though the policy contains a clause that " in any matter relating to this insurance, no person, unless authorized in writing, shall be deemed the agent of the company." Hart v. Niagara Fire Ins. Co., 38 Pac. 213; 9 Wash. 620.

Whoever solicits insurance on behalf of any life insurance company, not chartered in this State, or transmits an application or policy for such company, or advertises that he will receive or transmit the same, shall be held to be the agent of such company to all intents and purposes. Starr & Curtis' Statutes, page 1346, Sec. 115, under Life Insurance; Continental Ins. Co. v. Ruckman, 127 Ill. 375; Electric Life Ins. v. Fahrenkrug, 68 Ill. 463; Bodine v. Exchange Fire Ins. Co., 51 N. Y. 117; Schomer v. Hekla Fire Ins. Co., 50 Wis. 575; Knox v. Lycoming Fire Ins. Co., 50 Wis. 671; Alkan v. New Hampshire Ins. Co., 53 Wis. 136; Body v. Hartford Fire Ins. Co., 63 Wis. 157; Bennett v. Council Bluffs Ins. Co., 70 Iowa, 600; Pierce v. People, 106 Ill. 11; People v. People's Ins. Exchange, 126 Ill. 466; Continental Ins. Co. v. Chamberlain, 132 U. S. 304; Cook v. Federal Life Ins. Co., 74 Iowa, 746; 76 Iowa, 282.

A doctor who examines an applicant for a life insurance company is the agent of the company, and if he makes mis-

statements, or induces the assured to make false statements, the company is estopped to set them up as a defense. Mutual Life Ins. of N. Y. v. Blodgett, 27 S. W. Rep. 286; Pudritzky v. Supreme Lodge Knights of Honor, 43 N. W. Rep. (Mich.) 373; McArthur v. Association, 35 N. W. Rep. 430; Dunbar v. Ins. Co., 40 N. W. Rep. 386; Lemmink v. Ins. Co., 4 N. W. Rep. 469.

GEORGE B. SHATTUCK, attorney for defendant in error.

An insurance agent acts as an insurance broker; he is agent for the insured and not the insurer. Hartford Ins. Co. v. Reynolds, 36 Mich. 502.

The agent of the insurer whose authority is limited to receive and transmit applications and who prepares the application for the insured, is for that purpose the agent of the insured and must bear the responsibility for errors made by him in the application. Wilson v. Conway Fire Ins. Co., 4 R. I. 141.

A limited agency in a case of life insurance will not be extended by operation of law to the act done by the agent in fraud of his principal and for the benefit of the insured, especially where it is within the power of the insured by the use of reasonable diligence to obviate the fraudulent intent. Ellen Ryan v. World Mutual Life Ins. Co., 41 Conn. 168; N. Y. Life Ins. Co. v. Fletcher, 117 U. S. 519; Vose v. Eagle Life & Health Ins. Co., 6 Cush. 42; Ins. Co. v. Pyle, 44 Ohio St. 19; Jeffries v. Life Ins. Co., 22 Wall. 47; Ætna Life Ins. Co. v. France, 91 U. S. 510; National Life Ins. Co. v. Minch, 53 N. Y. 144; Lowell v. Middlesex Mutual Life Ins. Co., 8 Cush. 127; Bliss on Life Ins., 2d Ed., Sec. 38; Pottsville Mutual Fire Ins. Co. v. Fromm, 100 Pa. St. 347; Maine Benefit Ass'n v. Parks, 81 Me. 79.

MR. JUSTICE SEARS delivered the opinion of the court.

The only questions settled upon the former appeal in this cause were such as related to the sufficiency of the allegations of the bill of complaint and the jurisdiction of a court of equity in the case. Security Trust Co. v. Tarpey, 66 Ill. App. 589.

The cause is now presented after a hearing upon bill and cross-bill and answers and replications thereto, and the question now involved is as to the sufficiency of the evidence to sustain the finding of the trial court that the allegations of the original bill of complaint are true.

The bill of complaint alleges that Cummings made application to defendant in error for the policies of insurance in question, and in so doing answered certain questions and warranted that his answers were true; that the statements thus warranted to be true were, in effect, that he had not made any application for life insurance which had been rejected, and that his health was good; that the statements were false and fraudulently made to deceive defendant in error; that by such false and fraudulent representations the policies were obtained, and that on November 3, 1895, during the lifetime of Cummings, the defendant had tendered back premiums paid, and demanded a surrender of the policies; that in February, 1896, Cummings died; that plaintiff in error is the beneficiary named in the policies, and prays for a decree canceling the policies.

Among the other papers presented to Kellogg, the agent of defendant in error, in connection with the issuing of the policies, was what is termed " Supplementary application, —statements made to the medical examiner as part of the application to the Trust Company."  In it is contained this clause :

" I declare that I am the person above described and understand the questions and answers in the above supplementary application and warrant said answers to be true.  I agree that if, during my lifetime, any statements therein or in the original application are alleged to be untrue, and I fail when called upon to furnish to said company satisfactory evidence of their truth, the policy of insurance issued upon the faith of such statements and answers shall be *ipso facto* void, and I agree to surrender said policy upon tender or payment to me of the aggregate premiums paid.

Dated this 6 day of Oct., 1895.

WM. C. CUMNINGS,
Person Examined."

This agreement constituting an express warranty by the insured of the truth of the statements referred to, it would seem clear that if the statements were false, and can be imputed to the insured as statements fraudulently made by him, as alleged in the bill of complaint, then the policies were subject to cancellation at the election of defendant in error.

The statement that Cummings had not applied for other life insurance and been rejected, was false as related to the time of the application to defendant in error, but was true as related to the application to the Iowa company. When he applied to the Iowa company he had never been rejected. When he applied to the defendant in error, he had been rejected by the Iowa company, and defendant in error well knew this fact through its acknowledged general agent, Kellogg.

The application to defendant in error, in which this statement occurs, now alleged to have been false, was merely a copy of the application to the Iowa company; was made merely as a copy at suggestion of Kellogg, and was signed by Cummings as a copy only of that which was true when made. No one was deceived by this statement. Kellogg knew of the application to the Iowa company, and that the securing of the risk for defendant in error depended upon the rejection by the former company. Kellogg testified: "Bate and Neuer didn't tell me Cummings had been rejected at the time they brought the application in, but did afterward, before I had forwarded the policy, but after the application had been forwarded." It is apparent from other evidence that it was only in the event that the Iowa company rejected, that defendant in error was to attempt to secure the risk. It would be contrary to conscience and common sense to treat this as a false statement made to deceive this company. It is argued that in this class of cases the warranty of truth is held to be obligatory, whether the statement warranted be material or not. But we hold that this copy signed by Cummings was not in fact his statement of that which was false, but merely a copy of a statement

which is conceded to have been true when made and was accepted as such copy by defendant in error.

The remaining question is, was the statement as to good health a false statement, and is it to be imputed to Cummings as a statement by which he deceived the defendant in error.

The statement in this behalf claimed to have been false, is differently framed in the application to the Iowa company, in the application to defendant in error, and in the supplementary application so-called.    In the former, the applicant stated, "Have not now nor have ever had disease of lungs; I have had pneumonia."    In the application to defendant he stated: "I am now in good health of body and mind.    I have never been afflicted, during the past ten years, with any sickness, disease, ailment, injury or complaint."    And in the supplementary application the following statements were contained: "I have never had habitual cough, raising or coughing blood; difficult or short breathing, habitual expectoration, pain in chest, or pulmonary system.    I have not now, nor have ever had disease of lungs, or la grippe.    I have had pneumonia.    I have had no ailment since childhood.    The pneumonia above mentioned occurred when applicant was eight years old."

The evidence as to the truth or falsity of these statements at the time when they were made is briefly as follows: Two physicians testify, each a witness called by the defendant in error.    Dr. Ridlon, who made the original examination for the Iowa company, and who also made, after the rejection by the Iowa company, the certificate of examination for the defendant in error, testified that there was "a prolonged expiratory murmur at the top of the right lung" at the time of his original examination of Cummings; that he so notified Cummings; that he said in substance to Cummings, that if it were tuberculosis he should go away to some different climate, and if it was not tuberculosis, it was a matter of no importance, and that he advised Cummings to consult a specialist.    This physician

further testified that there was but a small area of the lung affected, not enough to cause any inconvenience to the patient, and that Cummings might or might not know that he was sick at all. Dr. Johnstone, the other physician who testified, stated that at his examination on October 31, 1895, after the issuing of the policies, he found Cummings suffering from what he, Cummings, claimed was a cold recently contracted, but that he was then, in fact, in the opinion of witness, afflicted with tubercular consumption. He also stated that he was unable to see how the disease could have then been in progress for less than three months.

Neither physician made any examination of the sputum, and Dr. Ridlon testified that by no other means could it be accurately determined whether the patient was suffering from tuberculosis.

Bate, one of the agents who transacted the business of the insurance in question, testified that at the time of the application Cummings " appeared all right as to health." Eight witnesses called by plaintiff in error, testified that at the time in question Cummings appeared perfectly healthy and well, excepting that one of these witnesses testified that Cummings had a slight cold. Another witness, Mrs. Kane, testified that she was present when Dr. Ridlon examined Cummings, and that she heard Cummings ask the doctor " if he thought that there was anything the matter with his lungs," and that the doctor, after examination, said that " if there was anything the matter with his lungs, he could not detect it."

From a careful examination of all the evidence we think that the preponderance of it goes to establish that Cummings, except for information given him by the examining physician, supposed himself to be in a fair state of health, and that if there was then any tubercular condition of the lungs, it was latent and not known to Cummings himself. It is true, that his application to the Iowa company having been refused, he might therefrom have reasoned that there was something unfavorable in the physician's opinion of his history or his condition; but the evidence indi-

cates that Dr. Ridlon, who was the physician upon whom the defendant relied for advice, gave a report of his conclusions to Cummings which was likely to lull him into a feeling of security as to his health, and did not make known to him all of his unfavorable opinion which he reported to the defendant in error.

That under the facts here, Dr. Ridlon was the agent of the defendant for the purposes of the examination of Cummings, we think is clearly established, and without any contradiction or conflict in the evidence.     Royal Neighbors v. Bowman, 177 Ill. 27.

He reported the condition of Cummings accurately to defendant, so far as he could discern it, and this included all that Cummings could, from the evidence, be said to have known of the matter, and more.     Nothing which Cummings said in any of his statements could have misled defendant in error, for it was fully informed.

Questions as to the agency of Dr. Ridlon, Bate and Neuer are not controlling, for the information as to the previous application and refusal and the information as to condition of health, all reached the appellee through Kellogg, as to whose agency no question is raised.

We therefore hold that the finding that these statements as to previous application and as to health were falsely made by Cummings, as alleged, and for the purpose of deceiving defendant in error, and that defendant was thereby deceived, is against the clear preponderance of the evidence.

The writer is of opinion that the decree should be reversed and the cause remanded for another trial ; but in conformity with the views of a majority of the court, the decree is reversed and the cause is remanded, with directions to the Superior Court to dismiss the bill of complaint of defendant in error for want of equity, and to enter a decree in accordance with the prayer of the cross-bill of plaintiff in error. Reversed and remanded with directions.